## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| BART GILLEN, Individually and on Behalf of All Others Similarly Situated, | Case No.: 3:24-cv-01372 |
| Plaintiff, | |
| v. | |
| AT&T INC., | **JURY TRIAL DEMANDED** |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiff Bart Gillen ("Plaintiff") on behalf of himself and all others similarly situated, brings this Class Action Complaint against Defendant AT&T, Inc. ("AT&T" or "Defendant"), a Texas Corporation. Plaintiff alleges as follows based upon information and belief and investigation of counsel, except as to the allegations specifically pertaining to himself, which is based on his personal knowledge.

### INTRODUCTION

1.      Plaintiff brings this action to remedy the harms by Defendant's failure to adequately secure and safeguard personally identifiable information ("PII" or "Private Information") including, but not limited to, full names, email addresses, mailing addresses, phone numbers, social security numbers, dates of birth, AT&T account numbers, and passcodes.

2.      On or about March 17, 2024, Defendant experienced a cybersecurity incident ("Data Breach"), whereby the PII of Plaintiff and approximately 73 million Class Members,

including 7.6 million current AT&T customers and 65.4 million former AT&T customers, was exfiltrated.[1]

3.    Defendant is one of the largest wireless carriers and internet providers in the country.

4.    Plaintiff's and Class Members' sensitive personal information – which they entrusted to Defendant on the mutual understanding that Defendant would protect it against disclosure – was targeted, compromised, and unlawfully accessed due to the Data Breach.

5.    AT&T collected and maintained certain PII and protected health information of Plaintiff and the putative Class Members (defined below), who are (or were) customers of Defendant.

6.    The PII compromised in the Data Breach was exfiltrated by cyber-criminals and remains in the hands of those cyber-criminals who target PII for its value to identity thieves.

7.    As a result of the Data Breach, Plaintiff and approximately 73 million Class Members (including 7.6 million current customers and 65.4 million former customers),[2] suffered concrete injuries-in-fact including, but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) uncompensated lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized

---

[1]    Aimee Ortiz, *AT&T Resets Millions of Passcodes After Customer Records Are Leaked*, NY TIMES (Mar. 30, 2024), https://www.nytimes.com/2024/03/30/business/att-passcodes-reset-data-breach.html.

[2]    *Id.*

third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

8.     The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect consumers' PII from a foreseeable and preventable cyber-attack.

9.     Moreover, upon information and belief, Defendant was targeted for a cyber-attack due to its status as a telecom company that collects and maintains highly valuable PII on its systems.

10.    Defendant maintained, used, and shared the PII in a reckless manner.  In particular, the PII was used and transmitted by Defendant in a condition vulnerable to cyberattacks.  Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiff's and Class Members' PII was a known risk to Defendant, and thus, Defendant was on notice that failing to take steps necessary to secure the PII from those risks left that property in a dangerous condition.

11.    Defendant disregarded the rights of Plaintiff and Class Members by, *inter alia*, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiff and Class Members prompt and accurate notice of the Data Breach.

12.    Plaintiff's and Class Members' identities are now at risk because of Defendant's negligent conduct, as the PII that Defendant collected and maintained has been accessed and acquired by data thieves.

13.     Armed with the PII accessed in the Data Breach, data thieves have already engaged in identity theft and fraud, and can in the future commit a variety of crimes including, *e.g.*, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

14.     As a result of the Data Breach, Plaintiff and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiff and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft.

15.     Plaintiff and Class Members may also incur out of pocket costs, *e.g.*, for purchasing credit-monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

16.     Plaintiff brings this class action lawsuit on behalf all those similarly situated to address Defendant's inadequate safeguarding of Class Members' PII that it collected and maintained, and for failing to provide timely and adequate notice to Plaintiff and other Class Members that their information had been subject to the unauthorized access by an unknown third party and precisely what specific type of information was accessed.

17.     Through this Complaint, Plaintiff seeks to remedy these harms on behalf of himself and all similarly situated individuals whose PII was accessed during the Data Breach.

18.     Plaintiff and Class Members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because Plaintiff and at least

one member of the Class, as defined below, is a citizen of a different state than Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interests and costs.

20.    This Court has personal jurisdiction over Defendant AT&T Inc. because its principal place of business is located in the Dallas Division of the Northern District of Texas and the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District. The Defendant is a citizen of Texas.

21.    This Court is the proper venue for this case pursuant to 28 U.S.C. §1391 because Defendant's principal place of business is in the Dallas Division of the Northern District of Texas and the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

## PARTIES

22.    Plaintiff Bart Gillen is a natural person, resident, and citizen of the state of California, residing in Alameda County.

23.    Defendant AT&T Inc. is a corporation organized under the state laws of Delaware with its headquarters and principal place of business located at 208 South Akard St., Dallas, Texas 75202.  The registered agent for service of process is CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.  Defendant is a citizen of Texas.

## FACTUAL ALLEGATIONS

**A.    Defendant Provides Consumers with Telecommunications and Internet Services which Involve Collecting and Storing Highly Sensitive Data**

24.    Defendant is one of the largest wireless carriers and internet providers in the country.

25.    Plaintiff and Class Members are current and former customers of Defendant.

26.    In the course of their relationship, customers, including Plaintiff and Class Members, provided Defendant with at least the following: names, dates of birth, phone numbers, Social Security numbers, and other sensitive information.

27.    Upon information and belief, in the course of collecting PII from customers, including Plaintiff, Defendant promised to provide confidentiality and adequate security for the data it collected from customers through its applicable privacy policy and through other disclosures in compliance with statutory privacy requirements.

28.    Indeed, Defendant provides on its website that:

> We work hard to safeguard your information using technology controls and organizational controls.  We protect our computer storage and network equipment. We require employees to authenticate themselves to access sensitive data.  We limit access to personal information to the people who need access for their jobs.  And we require callers and online users to authenticate themselves before we provide account information.[3]

29.    Plaintiff and the Class Members, as customers of Defendant, relied on these promises and on this sophisticated business entity to keep their sensitive PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.  Consumers, in general, demand security to safeguard their PII, especially when their Social Security numbers and other sensitive PII are involved.

**B.    The AT&T Data Breach**

30.    On or about March 2024, the details of 73 million former and current AT&T Customer accounts, including full names, email addresses, mailing addresses, phone numbers,

---

[3]    *AT&T Privacy* Notice, AT&T (Dec. 11, 2023), https://about.att.com/privacy/privacy-notice.html.

dates of birth, social security numbers, AT&T account numbers, and passcodes were leaked online.[4]

31.    "Details of the leaked data first appeared online in August 2021, when a known threat actor, ShinyHunters, offered up the records for sale on a hacking forum, with a 'buy it now' price of one million dollars."[5]  In March 2024, "that same data appears to have been made available for free by another threat actor, MajorNelson."[6]

32.    Defendant had obligations created by the FTC Act, contract, common law, and industry standards to keep Plaintiff's and Class Members' PII confidential and to protect it from unauthorized access and disclosure.

33.    Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information it was maintaining for Plaintiff and Class Members, causing the exposure of PII, such as encrypting the information or deleting it when it is no longer needed.

34.    The attacker accessed and acquired files Defendant shared with a third party containing unencrypted PII of Plaintiff and Class Members.  Plaintiff's and Class Members' PII was accessed and stolen in the Data Breach.

35.    Plaintiff further believes that his PII and that of Class Members was subsequently sold on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyberattacks of this type.

## C.    Data Breaches Are Preventable

---

[4]    Aimee Ortiz, *AT&T Resets Millions of Passcodes After Customer Records Are Leaked*, NY TIMES (Mar. 30, 2024), https://www.nytimes.com/2024/03/30/business/att-passcodes-reset-data-breach.html.

[5]    *Id*.

[6]    *Id.*

36.     Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information it was maintaining for Plaintiff and Class Members, causing the exposure of PII, such as encrypting the information or deleting it when it is no longer needed, causing the exposure of PII.

37.     Defendant could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting its equipment and computer files containing PII.

38.     As explained by the Federal Bureau of Investigation, ("FBI"), "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[7]

39.     To prevent and detect cyber-attacks and/or ransomware attacks, Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

---

[7]     *How to Protect Your Networks from RANSOMWARE* at 3, FEDERAL BUREAU OF INVESTIGATION, https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls – including file, directory, and network share permissions – with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.[8]

40. To prevent and detect cyber-attacks or ransomware attacks, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

---

[8]    *Id*. at 3-4.

**Secure internet-facing assets**

-     Apply latest security updates
-     Use threat and vulnerability management
-     Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

-     Prioritize and treat commodity malware infections as potential full compromise; Include IT Pros in security discussions
-     Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

-     Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**

-     Monitor for adversarial activities
-     Hunt for brute force attempts
-     Monitor for cleanup of Event Logs
-     Analyze logon events;

**Harden infrastructure**

-     Use Windows Defender Firewall
-     Enable tamper protection
-     Enable cloud-delivered protection
-     Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[9]

41. Given that Defendant was storing the PII of its current and former customers, Defendant could and should have implemented all of the above measures to prevent and detect cyberattacks.

---

[9]     *See Human-operated ransomware attacks: A preventable disaster*, MICROSOFT SECURITY BLOG, (Mar 5, 2020), https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/.

42.    The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and data thieves acquiring and accessing the PII of more than 70 million individuals, including that of Plaintiff and Class Members.

**D.    Defendant Acquires, Collects, and Stores Its Customers' PII**

43.    Defendant acquires, collects, and stores a massive amount of PII from its current and former customers.

44.    As a condition of obtaining products and/or services from Defendant, Defendant requires that customers and other personnel entrust it with highly sensitive personal information.

45.    By obtaining, collecting, and using Plaintiff's and Class Members' PII, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' PII from disclosure.

46.    Plaintiff and the Class Members have taken reasonable steps to maintain the confidentiality of their PII and would not have entrusted it to Defendant absent a promise to safeguard that information.

47.    Upon information and belief, in the course of collecting PII from customers, including Plaintiff, Defendant promised to provide confidentiality and adequate security for their data through its applicable privacy policy and through other disclosures in compliance with statutory privacy requirements.

48.    Indeed, Defendant provides on its website that:

We work hard to safeguard your information using technology controls and organizational controls. We protect our computer storage and network equipment. We require employees to authenticate themselves to access sensitive data. We limit access to personal information to the people who need access for their jobs. And

we require callers and online users to authenticate themselves before we provide account information.[10]

49.    Plaintiff and the Class Members relied on Defendant to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

**E.    Defendant Knew, or Should Have Known, of the Risk Because Telecom Companies in Possession of PII Are Particularly Susceptible to Cyber Attacks**

50.    Defendant's data-security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting telecom companies that collect and store PII, like Defendant, preceding the date of the breach.

51.    Data breaches, including those perpetrated against telecom companies that store PII in their systems, have become widespread.

52.    In the third quarter of the 2023 fiscal year alone, 7333 organizations experienced data breaches, resulting in 66,658,764 individuals' personal information being compromised.[11]

53.    In light of recent high-profile data breaches at other industry leading companies, including, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendant knew or should have known that the PII that it collected and maintained would be targeted by cybercriminals.

---

[10]    *See AT&T Privacy* Notice, AT&T (Dec. 11, 2023), https://about.att.com/privacy/privacy-notice.html.

[11]    *See ITRC Q3 Data Breach Analysis*, IDENTITY THEFT RESOURCE CENTER, https://www.idtheftcenter.org/publication/q3-data-breach-2023-analysis/.

54.     Indeed, cyber-attacks, such as the one experienced by Defendant, have become so notorious that the FBI and the U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack.  As one report explained, smaller entities that store PII are "attractive to ransomware criminals . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[12]

55.     Additionally, as companies became more dependent on computer systems to run their business,[13] *e.g.*, working remotely as a result of the COVID-19 pandemic, and the Internet of Things ("IoT"), the danger posed by cybercriminals is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.[14]

56.     Defendant knew and understood unprotected or exposed PII in the custody of companies, like Defendant, is valuable and highly sought after by nefarious third parties seeking to illegally monetize that PII through unauthorized access.

57.     At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members and of the foreseeable consequences that would occur if Defendant's data security system was breached, including,

---

[12]     Ben Kochman, *FBI Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/consumerprotection/articles/1220974/fbi-secret-service-warn-oftargeted-ransomware?nl_pk=3ed44a08-fcc2-4b6c-89f0-aa0155a8bb51&utm_source=newsletter&utm_medium=email&utm_campaign=consumerprotection.

[13]     Danny Brando, *et al.*, *Implications of Cyber Risk for Financial Stability*, BOARD OF GOVERNORS OF THE FEDERAL RESERVE (May 12, 2022), https://www.federalreserve.gov/econres/notes/feds-notes/implications-of-cyber-risk-for-financial-stability-20220512.html.

[14]     Dr. Suleyman Ozarslan, *Key Threats and Cyber Risks Facing Financial Services and Banking Firms in 2022*, PICUS SECURITY, (Mar. 24, 2022), https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022.

specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

58.    Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights.  The Class is incurring, and will continue to incur, such damages in addition to any fraudulent use of their PII.

59.    The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class Members.

60.    The ramifications of Defendant's failure to keep secure the PII of Plaintiff and Class Members are long lasting and severe.  Once PII is stolen – particularly Social Security numbers and PII – fraudulent use of that information and damage to victims may continue for years.

61.    As a telecom company in custody of the PII of its customers, Defendant knew, or should have known, the importance of safeguarding PII entrusted to it by Plaintiff and Class Members, and of the foreseeable consequences if its data security systems were breached.  This includes the significant costs imposed on Plaintiff and Class Members as a result of a breach. Defendant failed, however, to take adequate cybersecurity measures to prevent the Data Breach.

**F.    Defendant's Insufficient Data Security Caused the Data Breach**

62.    Security experts, both private and governmental, have long warned companies that data security must be a top priority.  The Federal Trade Commission ("FTC"), for example, has also issued numerous guidelines for businesses highlighting the importance of reasonable data security practices.  The FTC notes the need to factor data security into all business decision-

making.[15]    According to the FTC, data security requires: (1) encrypting information stored on computer networks; (2) retaining payment card information only as long as necessary; (3) properly disposing of personal information that is no longer needed; (4) limiting administrative access to business systems; using industry tested and accepted security methods; (5) monitoring activity on networks to uncover unapproved activity; (6) verifying that privacy and security features function properly; (7) testing for common vulnerabilities; and (8) updating and patching third-party software.[16]

63.    The FTC treats the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5(a) of the FTC Act, 15 U.S.C. §45 ("FTC Act").

64.    As such, the FTC has issued orders against businesses that failed to employ reasonable measures to secure sensitive payment card data.  *See In the matter of Lookout Services, Inc.*, No. C-4326, ¶7 (June 15, 2011) ("[Defendants] allowed users to bypass authentication procedures" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks, such as employing an intrusion detection system and monitoring system logs."); *In the matter of DSW, Inc.*, No. C-4157, ¶7 (Mar. 7, 2006) ("[Defendants] failed to employ sufficient measures to detect unauthorized access."); *In the matter of The TJX Cos., Inc.*, No. C-4227 (Jul. 29, 2008) ("[R]espondent stored . . . personal information obtained to verify checks and process unreceipted returns in clear text on its in-store and corporate networks[,]" "did not require

---

[15]    *Start with Security A Guide For Business, Lessons Learned from FTC Cases*, FEDERAL TRADE COMM'N (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

[16]    *Id.*; *Protecting Personal Information, A Guide for Business*, FEDERAL TRADE COMM'N (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_protecting-personal-information.pdf.

network administrators . . . to use different passwords to access different programs, computers, and networks[,]" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks . . ."); *In the matter of Dave & Buster's Inc.*, No. C-4291 (May 20, 2010) ("[Defendants] failed to monitor and filter outbound traffic from its networks to identify and block export of sensitive personal information without authorization" and "failed to use readily available security measures to limit access between instore networks . . ."). These orders, which all preceded Defendant's Data Breach, further clarify the measures businesses must take to meet their data security obligations.

65.    Although Defendant's business involves handling highly sensitive data, Defendant implemented inadequate data security practices that it knew or should have known and put their customers at risk of having their PII exposed.

**G.    Value of Personally Identifying Information**

66.    The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[17]  The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[18]

---

[17]    17 C.F.R. §248.201 (2013).

[18]    *Id*.

67.    The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web.  Numerous sources cite dark web pricing for stolen identity credentials.[19]

68.    It is well known that PII is highly sensitive and is a frequent, intentional target of cybercriminals.  Companies that collect and handle such information, including Defendant, are well aware of the risk of being targeted by cybercriminals.

69.    Defendant also knew that a breach of its computer systems, and exposure of the sensitive information stored therein, would result in harm to such individuals.

70.    PII has considerable value and constitutes an enticing and well-known target to hackers.  Hackers easily can sell stolen data as there has been a "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[20]

71.    For example, PII can be sold at a price ranging from $40 to $200.17.[21]  Criminals can also purchase access to entire company data breaches from $900 to $4,500.[22]

72.    Moreover, Social Security numbers are among the worst kind of PII to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change.

---

[19]    Anita George, *Your personal data is for sale on the dark web.  Here's how much it costs*, DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-darkweb-how-much-it-costs/.

[20]    Brian Krebs, *The Value of a Hacked Company*, KREBS ON SECURITY (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/ (Feb. 29, 2024).

[21]    Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/.

[22]    *In the Dark*, VPNOVERVIEW (2019), https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/.

73.    According to the Social Security Administration, each time an individual's Social Security number is compromised, "the potential for a thief to illegitimately gain access to bank accounts, credit cards, driving records, tax and employment histories and other private information increases."[23]  Moreover, "[b]ecause many organizations still use SSNs as the primary identifier, exposure to identity theft and fraud remains."[24]

74.    The Social Security Administration stresses that the loss of an individual's Social Security number, as experienced by Plaintiff and some Class Members, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you.  Identity thieves can use your number and your good credit to apply for more credit in your name.  Then, they use the credit cards and don't pay the bills, it damages your credit.  You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought.  Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[25]

75.    In fact, "[a] stolen Social Security number is one of the leading causes of identity theft and can threaten your financial health."[26]  "Someone who has your SSN can use it to

---

[23]    *See Avoid Identity Theft: Protect Social Security Numbers*, U.S. SOCIAL SECURITY ADMINISTRATION,
https://www.ssa.gov/phila/ProtectingSSNs.htm#:~:text=An%20organization's%20
collection%20 and%20use,and%20other%20private%20information%20increases.

[24]    *Id*.

[25]    *Identity Theft and Your Social Security Number*, U.S. SOCIAL SECURITY ADMINISTRATION, (Jul. 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf.

[26]    *See How to Protect Yourself from Social Security Number Identity Theft*, EQUIFAX, https://www.equifax.com/personal/education/identity-theft/articles/-/learn/social-security-number-identity-theft/.

impersonate you, obtain credit and open bank accounts, apply for jobs, steal your tax refunds, get medical treatment, and steal your government benefits."[27]

76.    What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse.  In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

77.    Even then, a new Social Security number may not be effective.  According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[28]

78.    For these reasons, some courts have referred to Social Security numbers as the "gold standard" for identity theft.  *Portier v. NEO Tech. Sols.*, No. 3:17-CV-30111, 2019 WL 7946103, at *12 (D. Mass. Dec. 31, 2019) ("Because Social Security numbers are the gold standard for identity theft, their theft is significant. . . .  Access to Social Security numbers causes long lasting jeopardy because the Social Security Administration does not normally replace Social Security numbers."), *report and recommendation adopted*, No. 3:17-CV-30111, 2020 WL 877035 (D. Mass. Jan. 30, 2020); *see also McFarlane v. Altice USA, Inc.*, No. 20-CV-1297, 2021 WL 860584, at *4 (citations omitted) (S.D.N.Y. Mar. 8, 2021) (the court noted that Plaintiff's Social Security numbers are: arguably "'the most dangerous type of personal information in the hands of

---

[27]    *See* Julia Kagan, *What Is an SSN? Facts to Know About Social Security Numbers*, INVESTOPEDIA (Feb. 15, 2024), https://www.investopedia.com/terms/s/ssn.asp.

[28]    Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-shackers-has-millionsworrying-about-identity-theft.

identity thieves' because it is immutable and can be used to 'impersonat[e] [the victim] to get medical services, government benefits, . . . tax refunds, [and] employment.' Unlike a credit card number, which can be changed to eliminate the risk of harm following a data breach, '[a] social security number derives its value in that it is immutable,' and when it is stolen it can 'forever be wielded to identify [the victim] and target him in fraudulent schemes and identity theft attacks.'").

79.     Similarly, the California state government warns consumers that: "[o]riginally, your Social Security number (SSN) was a way for the government to track your earnings and pay you retirement benefits. But over the years, it has become much more than that. It is the key to a lot of your personal information. With your name and SSN, an identity thief could open new credit and bank accounts, rent an apartment, or even get a job."[29]

80.     The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the U.S. According to the Identity Theft Resource Center, in 2022, there were 1,802 reported data compromises in the United States, the second highest number of data events in a single year and only 60 events short of the record high number of events that occurred in 2021.[30] Of the 1,802 compromises reported in 2022, 98.4% were data breaches, affecting at least 392,180,551 victims in total, and 83% involved the exposure of sensitive records.[31]

---

[29]     *See* Rob Bonta, *Your Social Security Number: Controlling the Key to Identity Theft,* CALIFORNIA ATTORNEY GENERAL, https://oag.ca.gov/idtheft/facts/your-ssn.

[30]     *Data Breach Reports: 2022 End of Year Report,* IDENTITY THEFT RESOURCE CENTER (Jan. 25, 2023), at *7, https://www.idtheftcenter.org/publication/2022-data-breach-report.

[31]     *Id.* at *6, *21.

81.    In tandem with the increase in data breaches, the rate of identity theft and the resulting losses has also increased over the past few years.  The Bureau of Justice Statistics reported that, in 2021, about 23.9 million people in the United States were victims of an identity theft incident, and their losses totaled $16.4 billion.[32]  The increasing rate of identity theft is apparent from the directly preceding Bureau of Justice publication, which covered the data from 2018.  From 2018 to 2021, the number of persons affected increased by approximately one million, and monetary losses increased by $1.3 billion.[33]

82.    PII has considerable value and constitutes an enticing and well-known target for cybercriminals.  Hackers can easily sell stolen data as a result of the "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[34]

83.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts.  The information compromised in this Data Breach – Social Security numbers, dates of birth, and names – is impossible to "close" and difficult, if not impossible, to change.

84.    This data demands a much higher price on the black market.  Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information,

---

[32]    Erika Harrell & Alexandra Thompson, *Victims of Identity Theft, 2021*, BUREAU OF JUST. STAT. (Oct. 2023, NCJ 306474), https://bjs.ojp.gov/document/vit21.pdf.

[33]    Erika Harrell, *Victims of Identity Theft, 2018*, BUREAU OF JUST. STAT. (Apr. 2021, NCJ 256085), https://bjs.ojp.gov/content/pub/pdf/vit18.pdf.

[34]    Krebs, *supra* note 17.

personally identifiable information and Social Security numbers are worth more than 10x on the black market."[35]

85.     Further, according to the U.S. Government Accountability Office, which conducted a study regarding data breaches: "[I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft.  Further, once stolen data have [sic] been sold or posted on the [Dark] Web, fraudulent use of that information may continue for years.  As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[36]

86.     Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, and housing, or even give false information to police.

87.     The fraudulent activity resulting from the Data Breach may not come to light for years.  There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used.  According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft.  Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[37]

---

[35]     Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers,* NETWORKWORLD (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

[36]     *Report to Congressional Requesters, Personal Information*, U.S. GOV'T ACCOUNTABILITY OFFICE (June 2007), https://www.gao.gov/new.items/d07737.pdf.

[37]     *See supra* note 34.

88.     Even if stolen PII does not include financial or payment card account information, that does not mean there has been no harm or that the breach does not cause a substantial risk of identity theft.  Freshly stolen information can be used with success against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing.  In these forms of attack, the criminal uses the previously obtained PII about the individual, such as name, address, email address, and affiliations, to gain trust and increase the likelihood that a victim will be deceived into providing the criminal with additional information.

89.     Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights.  The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

90.     Based on the value of its customers' PII to cybercriminals, Defendant certainly knew the importance of safeguarding that information as well as the foreseeable risk of failing to do so.  However, Defendant still failed to take adequate cybersecurity measures to prevent the Data Breach from occurring.

## H.     Defendant Failed to Comply with FTC Guidelines

91.     The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices.  According to the FTC, the need for data security should be factored into all business decision-making.  Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the FTC Act.[38]

---

[38]     *See, e.g.*, *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

92.    The FTC's publication, "*Start with Security: A Guide for Business*," sets forth cybersecurity guidelines and best practices for businesses.[39]  These guidelines note, *inter alia*, that businesses should: (a) protect the personal customer information they collect and store; (b) properly dispose of personal information that is no longer needed; (c) encrypt information stored on computer networks; (d) understand network vulnerabilities; and (e) implement policies to correct security problems.  The FTC guidelines further recommend that all businesses use an intrusion detection system, monitor all incoming traffic for unusual activity, monitor for large amounts of data being transmitted from their system, and have a response plan ready in the event of a breach.[40]

93.    The FTC has brought enforcement actions against businesses for failing to protect customer data adequately and reasonably, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act.  Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

94.    Defendant was at all times fully aware of its obligation to protect the PII of its customers because of its position, which gave it direct access to reams of PII from its customers with which it contracts.  Defendant was also aware of the significant repercussions that would result from its failure to do so.

95.    Despite its obligation, Defendant failed to properly implement basic data security practices, and Defendant's failure to employ reasonable and appropriate measures to protect

---

[39]    Fed. Trade Comm'n, *supra* note 25.

[40]    *Id.*

against unauthorized access to patient PII constitutes an unfair act of practice prohibited by Section 5 of the FTC Act.

**I.    Defendant Failed to Comply with Industry Standards**

96.    Several best practices have been identified that, at a minimum, should be implemented by companies like Defendant, including but not limited to; educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

97.    Other standard cybersecurity business practices include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

98.    Upon information and belief Defendant failed to meet the minimum standards of one or more of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation, PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

99.    Defendant failed to comply with these accepted standards, thereby permitting the Data Breach to occur.

**J.    Common Injuries and Damages**

100.    As a result of Defendant's ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of PII ending up in the possession of criminals,

the risk of identity theft to the Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) uncompensated lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

## K.    Data Breaches Increase Victims' Risk of Identity Theft

101.    The unencrypted PII of Class Members will end up for sale on the dark web as that is the *modus operandi* of hackers.

102.    Unencrypted PII may also fall into the hands of companies that will use the detailed PII for targeted marketing without the approval of Plaintiff and Class Members.  Simply put, unauthorized individuals can easily access the PII of Plaintiff and Class Members.

103.    The link between a data breach and the risk of identity theft is simple and well established.  Criminals acquire and steal PII to monetize the information.  Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

104.    Plaintiff's and Class Members' PII is of great value to hackers and cybercriminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiff and Class Members and to profit off their misfortune.

105.    Due to the risk of one's Social Security number being exposed, state legislatures have passed laws in recognition of the risk: "[t]he social security number can be used as a tool to perpetuate fraud against a person and to acquire sensitive personal, financial, medical, and familial information, the release of which could cause great financial or personal harm to an individual. While the social security number was intended to be used solely for the administration of the federal Social Security System, over time this unique numeric identifier has been used extensively for identity verification purposes[.]"[41]

106.    Moreover, "SSNs have been central to the American identity infrastructure for years, being used as a key identifier[.] . . . U.S. banking processes have also had SSNs baked into their identification process for years.  In fact, SSNs have been the gold standard for identifying and verifying the credit history of prospective customers."[42]

107.    Despite the risk of fraud associated with the theft of Social Security numbers, just five of the nation's largest 25 banks have stopped using the numbers to verify a customer's identity after the initial account setup.[43]  Accordingly, since Social Security numbers are frequently used to verify an individual's identity after logging onto an account or attempting a transaction, "[h]aving access to your Social Security number may be enough to help a thief steal money from your bank account[.]"[44]

---

[41]    *See* N.C. Gen. Stat. §132-1.10(1).

[42]    *See* Husayn Kassai, *Banks need to stop relying on Social Security numbers*, AMERICAN BANKER (Nov. 12, 2018), https://www.americanbanker.com/opinion/banks-need-to-stop-relying-on-social-security-numbers.

[43]    *See* Ann Carrns, *Just 5 Banks Prohibit Use of Social Security Numbers,* NEW YORK TIMES (March 20, 2013), https://archive.nytimes.com/bucks.blogs.nytimes.com/2013/03/20/just-5-banks-prohibit-use-of-social-security-numbers/.

[44]    *See* credit.com, *What Can Someone Do With Your Social Security Number* (Oct. 19, 2023), https://www.credit.com/blog/5-things-an-identity-thief-can-do-with-your-social-securitynumber-108597/.

108.    One such example of criminals piecing together bits and pieces of compromised PII for profit is the development of "Fullz" packages.[45]

109.    With "Fullz" packages, cybercriminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

110.    The development of "Fullz" packages means here that the stolen PII from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers.  In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

111.    The existence and prevalence of "Fullz" packages means that the PII stolen from the Data Breach can easily be linked to the unregulated data of Plaintiff and the other Class Members.

---

[45]    "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more.  As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials.  Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web.  Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand.  Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See*, *e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm, Krebs on Security* (Sept. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texaslife-insurance.

112. Thus, even if certain information was not stolen in the Data Breach, criminals can still easily create a comprehensive "Fullz" package.

113. Then, this comprehensive dossier can be sold – and then resold in perpetuity – to crooked operators and other criminals (like illegal and scam telemarketers).

## L.    Loss of Time to Mitigate Risk of Identity Theft and Fraud

114. As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their PII was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet the resource and asset of time has been lost.

115. Plaintiff and Class Members have spent, and will spend, additional time in the future, on a variety of prudent actions, such as researching and verifying the legitimacy of the Data Breach. Accordingly, the Data Breach has caused Plaintiff and Class Members to suffer actual injury in the form of uncompensated lost time – which cannot be recaptured – spent on mitigation activities.

116. Plaintiff's mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[46]

---

[46] *See* United States Government Accountability Office, GAO-07-737, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* (June 2007), https://www.gao.gov/new.items/d07737.pdf.

117.    Plaintiff's mitigation efforts are also consistent with the steps that the FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[47]

118.    And for those Class Members who experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[48]

## M.    Diminution of Value of PII

119.    PII is a valuable property right.[49]  Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences.  Even this obvious risk to reward analysis illustrates beyond doubt that PII has considerable market value.

---

[47]      *See Identity Theft*.gov, FEDERAL TRADE COMMISSION, https://www.identitytheft.gov/Steps.

[48]      *See Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, at 2, U.S. GOVERNMENT ACCOUNTABILITY OFFICE (June 2007), https://www.gao.gov/new.items/d07737.pdf ("GAO Report").

[49]      *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf.

120.    Sensitive PII can sell for as much as $363 per record according to the Infosec Institute.[50]

121.    An active and robust legitimate marketplace for PII also exists.  In 2019, the data brokering industry was worth roughly $200 billion.[51]

122.    In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[52] [53]

123.    As a result of the Data Breach, Plaintiff's and Class Members' PII, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release.  However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss.  Moreover, the PII is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

124.    At all relevant times, AT&T knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members, and of the foreseeable consequences that would occur if Defendant's data security system was breached, including,

---

[50]    *See, e.g.*, John T. Soma, *et al.*, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 RICH. J.L. & TECH. 11, at 3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.").

[51]    *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, INFOSEC (July 27, 2015),    https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/.

[52]    David Lazarus, *Shadowy data brokers make the most of their invisibility cloak*, LOS ANGELES TIMES (Nov. 5, 2019), https://www.latimes.com/business/story/2019-11-05/column-data-brokers.

[53]    Datacoup, Inc. https://datacoup.com/.

specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

125.    The fraudulent activity resulting from the Data Breach may not come to light for years.

126.    Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights.  The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

127.    AT&T was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's network, amounting to more than 70 million individuals' detailed personal information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

128.    The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class Members.

**N.    Future Cost of Credit and Identity Theft Monitoring Is Reasonable and Necessary**

129.    Given the type of targeted attack in this case, sophisticated criminal activity, and the type of PII involved, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the PII for identity theft crimes – *e.g.*, opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

130.    Such fraud may go undetected until debt collection calls commence months, or even years, later.  An individual may not know that his or her PII was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud.

Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

131.    Consequently, Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future.

132.    The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member.  This is a reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach.

**O.    Loss of Benefit of the Bargain**

133.    Furthermore, Defendant's poor data security practices deprived Plaintiff and Class Members of the benefit of their bargain.  When agreeing to pay Defendant and/or its agents for products and/or services, Plaintiff and other reasonable consumers understood and expected that they were, in part, paying for the product and/or service and necessary data security to protect the PII, when in fact, Defendant did not provide the expected data security.  Accordingly, Plaintiff and Class Members received products and/or services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant.

**P.    Experiences of Plaintiff Bart Gillen**

134.    Plaintiff Bart Gillen is a current AT&T wireless customer.

135.    As a condition of obtaining products and/or services from AT&T, Plaintiff was required to provide his PII to Defendant, including his name, date of birth, phone number, Social Security number, and other sensitive information.

136.    At the time of the Data Breach, Defendant maintained Plaintiff's PII in its system.

137.    Plaintiff Bart Gillen is very careful about sharing his sensitive PII.  Plaintiff stores documents containing his PII in a safe and secure location.  He has never knowingly transmitted

unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff would not have entrusted his PII to Defendant had he known of Defendant's lax data security policies.

138.    On April 25, 2024, Plaintiff received a "Notice of Data Breach" from AT&T informing him that his PII has been improperly accessed and obtained by unauthorized third parties. The Notice stated that "AT&T has determined that some of your personal information was compromised." The Notice also stated that the information "may have included full name, email address, mailing address, phone number, Social Security number, date of birth, AT&T account number, and AT&T passcode."

139.    As a result of the Data Breach, Plaintiff made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach. Plaintiff has spent significant time dealing with the Data Breach – valuable time Plaintiff otherwise would have spent on other activities, including but not limited to, work and/or recreation. This time has been lost forever and cannot be recaptured.

140.    Plaintiff suffered actual injury from having his PII compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of his PII; (iii) lost or diminished value of PII; (iv) uncompensated lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to his PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

141.    The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed him of key details about the Data Breach's occurrence.

142.    As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

143.    As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

144.    Plaintiff Bart Gillen has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

**Q.    Plaintiff and Class Members Suffered Damages Due to the Data Breach**

145.    Cyberattacks and data breaches at companies like Defendant are especially problematic because they can negatively impact the overall daily lives of individuals affected by the attack.

146.    The GAO Report noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[54]

147.    Identity thieves use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

---

[54]    *See* U.S. Govt. Accounting Office, GAO-07-737, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* (2007), https://www.gao.gov/new.items/d07737.pdf (last visited Aug. 25, 2021).

148.    Moreover, theft of Private Information is also gravely serious.  Private Information is an extremely valuable property right.[55]

149.    Its value is axiomatic, considering the value of "big data" in corporate America and the fact that the consequences of cyber thefts include heavy prison sentences.  Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

150.    For the reasons mentioned above, Defendant's conduct, which allowed the Data Breach to occur, caused Plaintiff and Class Members significant injuries and harm in several ways.

## CLASS ACTION ALLEGATIONS

151.    Plaintiff brings this action against Defendant on behalf of himself and all other persons similarly situated (the "Class"), pursuant to Rule 23 of the Federal Rules of Civil Procedure.

152.    Specifically, Plaintiff seeks to represent the Class, subject to amendment as appropriate, and defined as follows:

> All individuals residing in the United States and its territories whose PII was accessed and/or acquired by an unauthorized party as a result of the data breach at Defendant in or about March 2024 (the "Class").

153.    Excluded from the Class are Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited

---

[55]    *See, e.g.*, John T. Soma, *et al*., *Corporate Privacy Trend: The "Value" of Personally Identifiable Information* ("PII"), at 3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.").

to, their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

154.    The proposed Class is defined based on the information available to Plaintiff at this time.  Plaintiff reserves the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

155.    <u>Numerosity</u>.  The members of the Class are so numerous that joinder of all members is impracticable, if not completely impossible.  Upon information and belief, more than 70 million individuals were impacted in the Data Breach.  The Class is apparently identifiable within Defendant's records, and Defendant has already identified these individuals (as evidenced by sending them breach notification letters).

156.    <u>Commonality</u>.    Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members.  These include:

- whether and to what extent Defendant had a duty to protect the PII of Plaintiff and Class Members;

- whether Defendant had respective duties not to disclose the PII of Plaintiff and Class Members to unauthorized third parties;

- whether Defendant had respective duties not to use the PII of Plaintiff and Class Members for non-business purposes;

- whether Defendant failed to adequately safeguard the PII of Plaintiff and Class Members;

- whether and when Defendant actually learned of the Data Breach;

- whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their PII had been compromised;

- whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their PII had been compromised;

- whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

- whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

- whether Plaintiff and Class Members are entitled to actual damages, statutory damages, and/or nominal damages as a result of Defendant's wrongful conduct;

- whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

157.    <u>Typicality</u>.  Plaintiff's claims are typical of the claims of the Class Members.  The claims of Plaintiff and the Class Members are based on the same legal theories and arise from the same unlawful and willful conduct.  Plaintiff, like every other Class Member, was exposed to virtually identical conduct and now suffers from the same violations of the law as each other member of the Class.

158.    <u>Adequacy of Representation</u>.  Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of Class Members.  Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class.  Plaintiff seeks no relief that is antagonistic or adverse to those of the other Members of the Class,

and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class Members. In addition, Plaintiff has retained counsel experienced in complex class action litigation, and Plaintiff's Counsel intends to prosecute this action vigorously.

159. Superiority. This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all Class Members is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense, and promote uniform decision-making.

160. Predominance. Common questions of law and fact predominate over any questions affecting only individual Class Members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendant's liability and the fact of damages are common to Plaintiff and each member of the Class. If Defendant breached its duty to Plaintiff and Class Members, then Plaintiff and each Class Member suffered damages by that conduct.

161. Injunctive Relief. Defendant has acted and/or refused to act on grounds that apply generally to the Class, making injunctive and/or declaratory relief appropriate with respect to the Class under Fed. R. Civ. P. 23(b)(2).

162. Ascertainability. Members of the Class are ascertainable. Class membership is defined using objective criteria, and Class Members may be readily identified through Defendant's books and records.

**COUNT ONE**
**NEGLIGENCE**
**(On Behalf of Plaintiff and the Class)**

163.    Plaintiff restates and realleges the allegations contained in every preceding paragraph as if fully set forth herein.

164.    Defendant requires its customers, including Plaintiff and Class Members, to submit non-public PII in the ordinary course of providing its products and/or services.

165.    Defendant gathered and stored the PII of Plaintiff and Class Members as part of its business of soliciting its services to its customers, which solicitations and services affect commerce.

166.    Plaintiff and Class Members entrusted Defendant with their PII with the understanding that Defendant would safeguard their information.

167.    Defendant had full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and Class Members could and would suffer if the PII were wrongfully disclosed.

168.    By voluntarily undertaking and assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard their computer property – and Class Members' PII held within it – to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which they could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

169.    Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. §45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

170.    Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks adequately protected the PII.

171.    Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between AT&T and Plaintiff and Class Members.  That special relationship arose because Plaintiff and the Class entrusted AT&T with their confidential PII, a necessary part of being customers of Defendant.

172.    Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential PII.

173.    Defendant was subject to an "independent duty," untethered to any contract between Defendant and Plaintiff or the Class.

174.    Defendant also had a duty to exercise appropriate clearinghouse practices to remove former customers' PII it was no longer required to retain pursuant to regulations.

175.    Moreover, Defendant had a duty to promptly and adequately notify Plaintiff and the Class of the Data Breach.

176.    Defendant had and continues to have a duty to adequately disclose that the PII of Plaintiff and the Class within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when.  Such notice was necessary to allow Plaintiff and the Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PII by third parties.

177.    Defendant breached its duties, pursuant to the FTC Act and other applicable standards, and thus was negligent, by failing to use reasonable measures to protect Class Members'

PII. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

- Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;

- Failing to adequately monitor the security of their networks and systems;

-  Allowing unauthorized access to Class Members' PII;

- Failing to detect in a timely manner that Class Members' PII had been compromised;

- Failing to remove former customers' PII it was no longer required to retain pursuant to regulations, and

- Failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

178.    Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

179.    Plaintiff and Class Members were within the class of persons the Federal Trade Commission Act was intended to protect and the type of harm that resulted from the Data Breach was the type of harm that the statute was intended to guard against.

180.    Defendant's violation of Section 5 of the FTC Act constitutes negligence.

181.   The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

182.   A breach of security, unauthorized access, and resulting injury to Plaintiff and the Class was reasonably foreseeable, particularly in light of Defendant's inadequate security practices.

183.   It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' PII would result in injury to Class Members.  Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the telecom industry.

184.   Defendant has full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and the Class could and would suffer if the PII were wrongfully disclosed.

185.   Plaintiff and the Class were the foreseeable and probable victims of any inadequate security practices and procedures.  Defendant knew or should have known of the inherent risks in collecting and storing the PII of Plaintiff and the Class, the critical importance of providing adequate security of that PII, and the necessity for encrypting PII stored on Defendant's systems or transmitted through third party systems.

186.   It was therefore foreseeable that the failure to adequately safeguard Class Members' PII would result in one or more types of injuries to Class Members.

187.   Plaintiff and the Class had no ability to protect their PII that was in, and possibly remains in, Defendant's possession.

188.   Defendant was in a position to protect against the harm suffered by Plaintiff and the Class as a result of the Data Breach.

189.    Defendant's duty extended to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship.  *See* Restatement (Second) of Torts §302B (1965).  Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

190.    But for Defendant's wrongful and negligent breach of duties owed to Plaintiff and the Class, the PII of Plaintiff and the Class would not have been compromised.

191.    There is a close causal connection between Defendant's failure to implement security measures to protect the PII of Plaintiff and the Class and the harm, or risk of imminent harm, suffered by Plaintiff and the Class.  The PII of Plaintiff and the Class was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

192.    As a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) uncompensated lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

193.     Additionally, as a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in its continued possession.

194.     Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

195.     Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

**COUNT TWO**
**NEGLIGENCE PER SE**
**(On Behalf of Plaintiff and the Class)**

196.     Plaintiff restates and realleges the allegations contained in every preceding paragraph as if fully set forth herein.

197.     Pursuant to the Federal Trade Commission Act, 15 U.S.C. §45, Defendant had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PII.

198.     Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by companies such as Defendant for failing to use reasonable measures to protect PII.  Various FTC publications and orders also form the basis of Defendant's duty.

199.     Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with the industry standards.  Defendant's conduct was particularly

unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of this Data Breach.

200.    Defendant's violation of Section 5 of the FTC Act constitutes negligence *per se*.

201.    Plaintiff and Class Members are consumers within the class of persons that Section 5 of the FTC Act was intended to protect.

202.    Moreover, the harm that has occurred is the type of harm the FTC Act was intended to guard against. Indeed, the FTC has pursued over 50 enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiff and Class Members.

203.    As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have been injured as described herein and above, and are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

## COUNT THREE
## BREACH OF IMPLIED CONTRACT
### (On Behalf of Plaintiff and the Class)

204.    Plaintiff restates and realleges the allegations contained in every preceding paragraph as if fully set forth herein.

205.    Plaintiff and Class Members were required to submit their PII to Defendant as part of the process of obtaining products and/or services at Defendant. Plaintiff and Class Members paid money, or money was paid on their behalf, to Defendant in exchange for products and/or services.

206.    Defendant solicited, offered, and invited Class Members to provide their PII as part of Defendant's regular business practices. Plaintiff and Class Members accepted Defendant's offers and provided their PII to Defendant.

207.    Defendant accepted possession of Plaintiff's and Class Members' PII for the purpose of providing services to Plaintiff and Class Members.

208.    Plaintiff and the Class entrusted their PII to Defendant.  In so doing, Plaintiff and the Class entered into implied contracts with Defendant by which Defendant agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and the Class if their data had been breached and compromised or stolen.

209.    In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations (including FTC guidelines on data security) and were consistent with industry standards.

210.    Implicit in the agreement between Plaintiff and Class Members and the Defendant to provide PII, was the latter's obligation to: (a) use such PII for business purposes only; (b) take reasonable steps to safeguard that PII; (c) prevent unauthorized disclosures of the PII; (d) provide Plaintiff and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their PII; (e) reasonably safeguard and protect the PII of Plaintiff and Class Members from unauthorized disclosure or uses; and (f) retain the PII only under conditions that kept such information secure and confidential.

211.    The mutual understanding and intent of Plaintiff and Class Members on the one hand, and Defendant, on the other, is demonstrated by their conduct and course of dealing.

212.    On information and belief, at all relevant times Defendant promulgated, adopted, and implemented written privacy policies whereby it expressly promised Plaintiff and Class Members that it would only disclose PII under certain circumstances, none of which relate to the Data Breach.

213.    Upon information and belief, Defendant further promised to comply with industry standards and to make sure that Plaintiff's and Class Members' PII would remain protected.

214.    Plaintiff and Class Members paid money to Defendant with the reasonable belief and expectation that Defendant would use part of its earnings to obtain adequate data security. Defendant failed to do so.

215.    Plaintiff and Class Members would not have entrusted their PII to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

216.    Plaintiff and Class Members would not have entrusted their PII to Defendant in the absence of their implied promise to monitor their computer systems and networks to ensure that it adopted reasonable data security measures.

217.    Every contract in this State has an implied covenant of good faith and fair dealing, which is an independent duty and may be breached even when there is no breach of a contract's actual and/or express terms.

218.    Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

219.    Defendant breached the implied contracts it made with Plaintiff and the Class by failing to safeguard and protect their personal information, by failing to delete the information of Plaintiff and the Class once the relationship ended, and by failing to provide accurate notice to them that personal information was compromised as a result of the Data Breach.

220.    Defendant breached the implied covenant of good faith and fair dealing by failing to maintain adequate computer systems and data security practices to safeguard PII, failing to timely and accurately disclose the Data Breach to Plaintiff and Class Members and continued

acceptance of PII and storage of other personal information after Defendant knew, or should have known, of the security vulnerabilities of the systems that were exploited in the Data Breach.

221.    As a direct and proximate result of Defendant's breach of the implied contracts, Plaintiff and Class Members sustained damages, including, but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) uncompensated lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

222.    Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

223.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

**COUNT FOUR**
**DECLARATORY JUDGMENT**
**(On Behalf of Plaintiff and the Class)**

224.    Plaintiff restates and realleges the allegations contained in every preceding paragraph as if fully set forth herein.

225.    Under the Declaratory Judgment Act, 28 U.S.C. §§2201, et seq., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant

further necessary relief.  Furthermore, the Court has broad authority to restrain acts, such as those alleged herein, which are tortious, and which violate the terms of the federal and state statutes described above.

226.    An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class Members' PII and whether Defendant is currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise their PII.  Plaintiff alleges that Defendant's data security measures remain inadequate. Defendant publicly denies these allegations.  Furthermore, Plaintiff continues to suffer injury as a result of the compromise of their PII and remain at imminent risk that further compromises of their PII will occur in the future.  It is unknown what specific measures and changes Defendant has undertaken in response to the Data Breach.

227.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a.    Defendant owed, and continues to owe, a legal duty to secure the sensitive information with which it is entrusted, and to notify impacted individuals of the Data Breach under the common law, and Section 5 of the FTC Act;

b.    Defendant breached, and continues to breach, its legal duty by failing to employ reasonable measures to secure customers' personal and financial information; and

c.    Defendant's breach of its legal duty continues to cause harm to Plaintiff and the Class.

228.    The Court should also issue corresponding injunctive relief requiring Defendant to employ adequate security protocols consistent with industry standards to protect their customers' data.

229.    If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy in the event of another breach of Defendant's data system.  If another breach of Defendant's data system occurs, Plaintiff and the Class will not have an adequate remedy at law because many of the resulting injuries are not readily quantified in full, and they will be forced to bring multiple lawsuits to rectify the same conduct.  Simply put, monetary damages, while warranted to compensate Plaintiff and the Class for their out-of-pocket and other damages that are legally quantifiable and provable, do not cover the full extent of injuries suffered by Plaintiff and the Class.

230.    The hardship to Plaintiff and the Class if an injunction is not issued exceeds the hardship to Defendant if an injunction is issued.  Plaintiff and Class Members will likely be subjected to further monetary harm and other damage.  On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

231.    Issuance of the requested injunction will not disserve the public interest.  To the contrary, such an injunction would benefit the public by preventing another data breach, thus eliminating the injuries that would result to Plaintiff, the Class, and the public at large.

## COUNT FIVE
## UNJUST ENRICHMENT
### (On Behalf of Plaintiff and the Class)

232.    Plaintiff restates and realleges the allegations contained in every preceding paragraph as if fully set forth herein.

233.    Plaintiff brings this Count in the alternative to the breach of implied contract count above.

234.    Plaintiff and Class Members conferred a monetary benefit on Defendant. Specifically, they paid Defendant and/or its agents for products and/or services and in so doing also provided Defendant with their PII.  In exchange, Plaintiff and Class Members should have received from Defendant the products and/or services that were the subject of the transaction and should have had their PII protected with adequate data security.

235.    Defendant knew that Plaintiff and Class Members conferred a benefit upon it and has accepted and retained that benefit by accepting and retaining the PII entrusted to it.  Defendant profited from Plaintiff's retained data and used Plaintiff's and Class Members' PII for business purposes.

236.    Defendant failed to secure Plaintiff's and Class Members' PII and, therefore, did not fully compensate Plaintiff or Class Members for the value that their PII provided.

237.    Defendant acquired the PII through inequitable record retention as it failed to investigate and/or disclose the inadequate data security practices previously alleged.

238.    If Plaintiff and Class Members had known that Defendant would not use adequate data security practices, procedures, and protocols to adequately monitor, supervise, and secure their PII, they would have entrusted their PII at Defendant or obtained products and/or services from Defendant.  Plaintiff and Class Members have no adequate remedy at law.

239.    Under the circumstances, it would be unjust for Defendant to be permitted to retain any of the benefits that Plaintiff and Class Members conferred upon it.

240.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy;

(ii) theft of their PII; (iii) lost or diminished value of PII; (iv) uncompensated lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

241.    Plaintiff and Class Members are entitled to full refunds, restitution, and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct.  This can be accomplished by establishing a constructive trust from which the Plaintiff and Class Members may seek restitution or compensation.

242.    Plaintiff and Class Members may not have an adequate remedy at law against Defendant, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, prays for relief as follows:

a.    For an Order certifying the Class, and appointing Plaintiff and his Counsel to represent the Class;

b.    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the PII of Plaintiff and Class Members;

c.    For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to, an order:

    i.    prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

    ii.    requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

    iii.    requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiff and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

    iv.    requiring Defendant to provide out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII for Plaintiff's and Class Members' respective lifetimes;

    v.    requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiff and Class Members;

    vi.    prohibiting Defendant from maintaining the PII of Plaintiff and Class Members on a cloud-based database;

vii.    requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

viii.    requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

ix.    requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

x.    requiring Defendant to segment data by, among other things, creating firewalls and controls so that if one area of Defendant's network is compromised, hackers cannot gain access to portions of Defendant's systems;

xi.    requiring Defendant to conduct regular database scanning and securing checks;

xii.    requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

xiii.    requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiv.    requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xv.    requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xvi.    requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect himself;

xvii.    requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and

xviii.    for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final

judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

d.      For an Order finding in favor of Plaintiff and the Class on all counts asserted herein;

e.      For damages in an amount to be determined by the trier of fact;

f.      Declaratory and injunctive relief as described herein;

g.      Awarding Plaintiff's reasonable attorneys' fees, costs, and expenses;

h.      Awarding pre- and post-judgment interest on any amounts awarded; and

i.      Awarding such other and further relief as may be just and proper.

## JURY TRIAL DEMANDED

A jury trial is demanded on all claims in this Class Action Complaint so triable.

Dated: June 5, 2024                     Respectfully submitted,

*/s/ Joe Kendall*
JOE KENDALL
Texas Bar No. 11260700
**KENDALL LAW GROUP, PLLC**
3811 Turtle Creek Blvd., Suite 825
Dallas, TX 75219
Telephone: 214-744-3000
Facsimile:  214-744-3015
jkendall@kendalllawgroup.com

Joseph P. Guglielmo (*pro hac vice* forthcoming)
Ethan S. Binder (*pro hac vice* forthcoming)
**SCOTT+SCOTT ATTORNEYS AT LAW**
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-4478
Facsimile:  212-223-6334
jguglielmo@scott-scott.com
ebinder@scott-scott.com

Alfred G. Yates, Jr. (*pro hac vice* forthcoming)
**LAW OFFICE OF ALFRED G. YATES, JR., P.C.**
1575 McFarland Road, Suite 305
Pittsburgh, PA 15216
Telephone: 412-391-5164
Facsimile: 412-471-1033
yateslaw@aol.com

*Counsel for Plaintiff and the Putative Class*